# CRIMINAL COURT OF BALTIMORE CITY.

Filed February 4, 1927.

### EX PARTE CAPT. CHARLES H. BURNS, CHIEF OF DETECTIVE BUREAU.

*Clarence W. Miles* and *Eugene A. Edgett* counsel for respondent, Capt. Burns.

**O'DUNNE, J.—**

Capt. Burns, it was an unhappy co-incidence in life (and to me a regrettable one) that in the discharge of public duty I felt constrained to reach the conclusion that you were technically guilty of what is known in law as "contempt of Court" growing out of a published interview regarding a serious felony indictment pending in the Criminal Court, and to have delivered that verdict within an hour or so of the time when the Chief Executive of Maryland, upon the recommendation of General Gaither, Police Commissioner of Baltimore, was pinning upon your breast a gold medal decoration for public service faithfully performed.

Your letter, which I direct to be filed in these proceedings, when read in connection with your testimony given the last of December, indicates:

(1) That it was not your intention that the statement given to the reporter should be published, but was intended as mere personal explanation to him and his paper of your action and your reasons for it; in the Neimoth-Sammons case.

(2) That you had no intention thereby to hinder, impede or in any wise contribute to the obstruction of justice in the case of Maryland vs. Neimoth and Sammons, indicted for the robbery of $47,000 of the Sonneborn payroll; and that neither the publication nor the possible far-reaching consequence thereof on a pending case were foreseen by you, nor were they intended.

(3) That you are not a lawyer, and are unfamiliar with legal precedents obtaining in such cases, and that you had never heretofore received legal advice from the Attorney General, or otherwise, as to when a case in law is a "pending cause," or what are the legal limitations applying not only to detective departments, but also to counsel, parties, litigant, public press and all other agencies, in such cases. For these reasons, and because of the high esteem in which you are held by your commanding officer, General Gaither, by reason of your good record in the department, I feel that probably the interest of public justice can be better promoted, and secure for the future that hearty co-operation between the Courts and the Police Department so essential to public justice, by this Court now relieving you of whatever embarrassment might attach to a verdict of guilty of contempt of Court.

Therefore it will be ordered that the verdict of guilty of contempt of Court be stricken out, and the citation for contempt is hereby quashed, and the respondent discharged Q. E. S. D.

As said in the original opinion filed in this case, what I was trying to accomplish was something *constructive* and not *destructive*. The object of this proceeding was to cause a more accurate survey to be made of the boundary lines of the *Judicial territory*, to the end that litigants seeking refuge within its borders might be, while there detained, protected from all *outside*, extrajudicial interference, pending legal determination.

Under the quaint and now happily obsolete ancient laws of England, there was once recognized the doctrine of "taking sanctuary." In a general way, it was that if a felon when pursued sought and obtained refuge in a church, he was free from attack while there so "taking sanctuary" (viz: by taking oath that he would abjure the realm and embark with all speed from any port assigned him). He thereby saved his life. When one forsakes the public forum, the platform and the press, and *"takes sanctuary"* in the

temples of justice, he is required to embark from such ports or at such time as the *judgment of Court* may direct, but not as public clamor may suggest, and cannot be assassinated or otherwise attacked from any outside source of such character as to even have a *tendency* to shape or affect that judgment.

Interference with the orderly procedure of Courts is one of the most serious problems today of public justice in its administration through the nation. The responsibility therefor, in my judgment, lies *primarily with the Courts* themselves. They have been too sluggish in protecting litigants "seeking sanctuary" within their domains. Some of the chief offenders herein have been the public prosecutors, in giving out advance information in the form of alleged confessions (sometimes obtained by third-degree methods or others bordering closely thereupon). Often-times the nature of such advance information is utterly inadmissible in the actual trial of the cause. This in turn has a tendency to stimulate counsel for defendant (who might otherwise be strongly disposed to observe the ethics of professional life), to retaliate in the same way, and spread his defense, or prospective defense, in the columns of the public press. These methods, in turn, promote discussion by the parties litigant. We hardly need illustrative cases of such character. During the recent trials of the Rylander case, the Hall case, the present Chicago "Carrington controversies," the Peaches-Brown nausium, there are daily advance interviews either of counsel or litigants, as to what the next day's proceeding will produce. We do not need to travel outside of our own jurisdiction for illustrations in recent years, even far more flagrant in character. The Public Press has, of course, been a great offender, but neither the sole nor the greatest offender. When information of sensational character is fed to these journalistic enterprises from such eminent sources as the prosecution, and counsel for defense, and when Courts sit supinely quiescent through such spectacular performances, can they, the Courts, in common justice, fix the responsibility for these breaches of decorum and of legal ethics, solely on the public press, without themselves sharing in a *generous manner* the responsibility for the contempt of law thereby promoted?

It so happens that it was in this connection and with regard to this very Neimoth-Sammons case, in its early stages, last October, that I called General Gaither's attention to some very sensational disclosures of extremely secret information that was broadcasted through the local and national press. It so happened that in that instance, the Police Department of Baltimore was *entirely free from blame* as General Gaither then pointed out to me. His department had in due course communicated the nature of their secret information to the Police Department of another City for co-operative action, and it had been released for publication at the other end of the line and flashed back to Baltimore through what is styled the "enterprise of modern journalism." While wholly free from blame in that instance, I took advantage of the co-operative spirit evinced by General Gaither in all matters theretofore during the ten months I was in the Criminal Court, to communicate with him in writing under date of Oct. 20th, 1926, to this effect:

* * * "The thing I deprecate is the constant detailing by sub-heads of departments (meaning detective department) of every clue, real and imaginary, about cases, where the suspect is not even apprehended. I think it is a great public evil; one that seriously interferes with the administration of justice; *and one that should be cured in* some way, by someone.

"*There are ways that it can be cured.* The department when running down clues, should be *muzzled.* The papers ought to have sense enough not to print such things, even if they are taken into the confidence of the department, but they seem to publish most everything of human interest, regardless of the public effect of such publication. * * * It is a criticism of your *subordinates*, and I so intend it, and I think the criticism, to that extent, is *richly deserved.*

"If they persist in this kind of publicity, to the detriment of public justice, there is power inherent *in this Court, sufficient to curb it.*

"I think you have disciplinary power sufficient to prevent it *your-*

*self*, to a very large extent, as the *head of the Police Department*.

"It is my strong personal and official desire to co-operate with you in the many and difficult problems you undoubtedly have, *not the least of which is this one*."

I naturally felt, therefore, if the internal disciplinary power of the head of the Police Department had not been sufficient to successfully cope with this undoubted evil of a serious character, well calculated to impede the orderly administration of justice, that this Court would be recreant to its public duty, if it did not "sua sponte," assume the full responsibility of curbing this constantly growing evil. Therefore, I acted in this case, for these obvious reasons.

I think the object has been accomplished. Both local and national thought have been directed to a consideration of the problem. It has created a better understanding and a better relation between the administration of Justice and the Public Press. Leading journalistic thought in some of the metropolitan cities of both the East and the West have taken up the discussion. Two editorials last week in such papers as the N. Y. Times, and articles in the N. Y. Herald-Tribune, as well as Boston and Chicago papers, all indicate a perfect willingness among some of the leaders of journalistic thought, to work in complete harmony with the orderly administration of justice. Yellow journalism can not long afford to go contrarywise, where the leaders in their profession point the way.

I believe it will be helpful to lawyers as well as to department heads and subheads, to know the boundary lines of public justice, and to respect them. There is no disposition of Courts to encroach on Executive or Legislative departments of government. Each is supreme in its own sphere, but must respect the domains of co-ordinate branches of government, and the Judicial branch is one of those. Courts must protect their own integrity, and those "seeking sanctuary" therein, if they expect others to respect their rights.

Taken as a whole, we are justly proud of our Police Department. There is room for improvement in spots.

General Gaither is head of a large force in a great City. He has proved himself a capable, conscientious and efficient public servant. He has a big program on hand for bettering and increasing the size of the police department. He deserves the united co-operation of the community in that effort. The more efficiently the city is policed, the better our name abroad, and the greater the value of property at home. Rural districts of the city can not develop, and property enhance in value, if law and order are not maintained. and suburban communities are not well policed. This takes more men and more money, in the ever increasing war on crime. It requires co-operation of Courts and Police Department. The Bar and the Press can be powerful adjuncts in this general work. I think this case has perhaps brought *us all* to a better understanding, and a truer realization of our relations, and, on the whole, will be productive of much public good when properly interpreted, with a just appreciation of the rights of each. No single agency can contribute more to that general result, than the Public Press, which I find entirely and satisfactorily, *co-operative*.

While speaking thus freely, generally and informally, may I also commend the counsel for the respondent in this case for their zeal of advocacy. They litigated their rights, or supposed rights, ably, fully and to the last resort. In so doing they had at all times the co-operation of this Court, even to the extent of friendly suggestions of how much further, and in what way, they might still further press questions of jurisdiction. At no time has there been any spirit of antagonism though throughout I disagreed with them on the merits of the controversy, as well as the technical questions of Jurisdiction or supposed jurisdiction of review or appeal.

In the final determination of this question today, they have shown a broad statesmanship that is higher than mere success gained through technical victories—even when obtainable. With their co-operation, and the co-operation of Capt. Burns and of General Gaither. we have been able to establish something *constructive* in character, which I hope will be productive of lasting benefit to *this* community, and which may be shared, to some extent, else-

where, through the co-operation of Judges and leaders of professional thought in the American Bar Association and the American Judicature Society who have evinced tremendous interest in these contempt proceedings, as indicated by their correspondence.

I am no longer in the Criminal Court, and have no desire to ever return to it. But if I accomplished nothing else in my less than a year's service there, than helping to bring about a better understanding between the Bench, Bar, litigants, police department and Public Press, which I think this citation has brought about, I would consider my time of service there not wholly vain. I hope from now on, all departments will work in harmony. Technical offense will from time to time occur. Courts are not captious in seizing on every technical violation that would sustain its action, but wherever public justice is *likely* to be interfered with by outside attack on those "taking sanctuary" in the law, I believe it to be the duty of a Judge to take cognizance of it, even on his own motion, *and to act* in defense of public justice.

Capt. Burns, you are discharged, the proceedings quashed. I hope that this time next year Gov. Ritchie will be decorating you with new honors, and among them will be one for "discreet silence," *"long and faithfully observed."*